BARDIS VAKILI (CA SBN 247783)
bvakili@aclusandiego.org
DAVID LOY (CA SBN 229235)
davidloy@aclusandiego.org
JONATHAN MARKOVITZ (CA SBN 301767)
jmarkovitz@aclusandiego.org
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, California 92138-7131
Telephone: 619.232.2121
Facsimile: 619.232.0036

Attorneys for Plaintiffs JAMIE WILSON and her minor child P.D.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

P.D., a minor, by his parent and next friend, JAMIE WILSON, and JAMIE WILSON on her own behalf,

Plaintiffs,

v.

CITY OF SAN DIEGO, OFFICER AZIZ BROU, OFFICER KELLY STEWART, SERGEANT CARMELIN RIVERA, DETECTIVE JAMES BARRERA, and DOES 1-10,

Defendants.

Case No.: 3: 17-cv-0296-H-BGS

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES; DEMAND FOR JURY TRIAL**

P.D., through his mother and next friend Jamie Wilson, and Ms. Wilson on her own behalf (collectively "Plaintiffs") allege as follows:

## I. INTRODUCTION

1. This is a civil rights complaint for declaratory and injunctive relief and damages arising from San Diego Police Department ("SDPD") officers' violations of the fundamental rights of a 16-year old youth, including his rights to be free from unreasonable searches and seizures, racial discrimination, and deprivations of due

process, among others guaranteed by the United States Constitution, California Constitution, and California law. The defendants violated these rights when they detained, cuffed, and searched P.D. and his four friends in the middle of the afternoon, not because the officers had reasonable suspicion that P.D. or his companions were engaged in any specific criminal activity, but because, as the officers would later admit under oath, they were black juveniles, some of whom were wearing blue, walking through a park in southeast San Diego on a particular day.

2. The defendants' violations did not stop there. When the unlawful stop-and-frisk yielded no evidence of a crime, rather than let the minors go on their way, the defendants expanded their unlawful search to a bag P.D. had been carrying. The officers arrested P.D. due to an unloaded revolver discovered as a fruit of the unlawful search. Before letting the other minors leave, the officers extracted their DNA based on their supposed "consent," which was procured in inherently coercive circumstances. The officers then seized P.D.'s DNA based on his supposed "consent" under inherently coercive circumstances, which he did not give knowingly and voluntarily, before transporting him to the police station for booking.

3. At no point prior to the DNA extractions did the officers attempt to obtain a warrant, and no exigent circumstances existed to justify a warrantless search and seizure of DNA. Instead, the officers took the DNA sample pursuant to written SDPD policy authorizing police to obtain children's DNA for investigative purposes based on their supposed consent. This policy fails to account for the well-recognized vulnerabilities of minors, particularly those in custody, or otherwise ensure that a minor's consent is truly knowing and voluntary. Furthermore, by not requiring parental notification until after DNA extraction, the policy excludes parents from participating in their child's decision to allow the government to possess his or her biological information indefinitely. As a result, in addition to

violating P.D.'s right to be free from unreasonable searches and seizures, the juvenile DNA policy and SDPD custom pursuant to that policy violated both P.D.'s and Ms. Wilson's privacy, due process and familial association rights.

4. Plaintiffs are entitled to damages, as well as judicial and equitable relief, to cure the violations of all of the abovementioned fundamental rights.

## II. JURISDICTION AND VENUE

5. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate related claims arising under the Constitution and laws of California.

6. The Court may award damages and grant declaratory and injunctive relief for constitutional violations pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and/or Federal Rules of Civil Procedure 57 and 65.

7. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events that give rise to this action occurred within this district and the defendants reside in this district and state.

8. The Court has personal jurisdiction over the defendants, all of whom, on information and belief, are residents of the state of California.

## III. PARTIES

9. Plaintiffs P.D. and Jamie Wilson are and were at all times mentioned herein citizens of California and residents of San Diego County.

10. The City of San Diego ("City" or "San Diego") is a duly organized and existing municipality under California law, located in San Diego County, California. The City has direct supervisory authority over SDPD and its officers, and SDPD policies are City policies for purposes of municipal liability.

11. Officers Aziz Brou and Kelly Stewart, Sergeant Carmelin Rivera, Detective James Barrera, and John Doe Nos. 1-10 (collectively, "Defendant

Officers") are police officers employed by the City of San Diego. The identity of the Defendants John Doe Nos. 1-10 are currently unknown to Plaintiffs, who reserve the right to amend this complaint to further identify them when such information becomes available through discovery or otherwise.

12. At all times relevant to this action, Defendant Officers were agents and employees of the City acting under color of state law and within the course and scope of their agency and employment. At all times relevant to this action, Defendant Officers were knowingly aiding and abetting or acting in concert with each other with respect to each act or omission alleged in this complaint.

13. With respect to state law claims pleaded in this action, California Government Code section 815.2 authorizes the vicarious liability of Defendant City for injuries proximately caused by the acts of Defendant Officers within the scope of their employment if those acts give rise to a cause of action against Defendant Officers.

14. All Defendants are sued in their official capacities for declaratory and injunctive relief as to all claims. All Defendants are also sued for damages arising from violations of 42 U.S.C. § 1983 and for violations of state law and the California Constitution.

15. Defendant Officers are also sued in their individual capacities for their violations of P.D.'s clearly established Fourth and Fourteenth Amendment rights.

## IV. FACTUAL ALLEGATIONS

*Unlawful Stop-and-Frisk and Racial Profiling*

16. At or around 3:30 pm on Wednesday, March 30, 2016, P.D. and four friends, all African American minors ages 15-16, were walking through Memorial Park in southeast San Diego.

17. Defendant Officers were purportedly expecting alleged gang activity in Memorial Park that day because they believe March 30 to be a supposed "West Coast Crip" "holiday."

18. While Defendants Brou and Stewart were monitoring the park, Detective Barrera notified them over the radio that some African American males wearing blue were seen in the park. Defendant Barrera directed Defendants Brou and Stewart to detain the African American males. P.D. was wearing a white long sleeve t-shirt with blue sleeves, black jeans, black shoes and red socks.

19. Defendants Brou and Stewart drove into the park and onto the grass in their police car, pulled up to the youths, got out, and commanded them to stop and sit on the bleachers. Defendant Stewart later testified that at that moment, the boys were not free to leave.

20. Defendants Stewart and Brou did not recognize any of the children as alleged gang members or associates from their previous experience as members of SDPD's Gang Suppression Team ("GST"), and none had tattoos the officers believed to be gang tattoos. A subsequent background check confirmed that none of the boys were in any gang database as alleged members or affiliates of any gang, and none were on probation or parole. There were no large gatherings or parties at the park at the time that the officers approached and detained P.D. and his friends.

21. Neither P.D. nor any of the minors took any actions creating any reasonable suspicion that they were engaged in or about to engage in any specific illegal activity at the time of the initial detention, or that any of them was armed and dangerous. No other facts created any such reasonable suspicion.

22. Instead, as Defendants Stewart and Brou later stated during juvenile court proceedings, they seized the youths because they were young black males in Memorial Park on March 30.

23. Defendants Stewart and Brou put P.D. and at least some of the youths in handcuffs and conducted a pat-down search of P.D. and each of the other youths. The stop-and-frisk revealed no weapons, contraband, or other evidence of illegal activity. The youths asked if they were free to leave, but the officers told them they were being detained and instructed them not to talk to each other.

24. During the seizure, the youths informed the officers that they had been playing basketball. P.D. had been carrying a duffle bag when he was detained. While P.D. was still handcuffed on the bleachers with his hands behind his back, Defendant Brou patted down the bag P.D. had been carrying, which was zipped closed on the ground and out of the reach of P.D. and the others. Defendant Brou then unzipped and searched the bag, finding an unloaded revolver but no ammunition. On information and belief, the revolver was lawfully registered to the father of one of the youths.

25. At some point during the detention, several more officers, including the remaining Defendant Officers, arrived in at least three additional police cars and surrounded the children.

26. At some point during the detention in the public park, at least one of the Defendant Officers ordered P.D. to expose his torso and took several photographs of him in that exposed state. On information and belief, Defendant Officers also photographed the other youths.

27. P.D. was compliant and cooperative throughout his detention, and nothing in his or the other youths' demeanors made Defendants Brou or Stewart feel unsafe or threatened. Defendants Brou and Stewart had no reasonable belief that P.D. was armed and dangerous when they searched P.D. and his bag.

*The Search and Seizure of P.D.'s DNA*

28. P.D. was placed in the back of a police car in handcuffs. From there he watched as some of Defendant Officers told the other four youths to sign documents purporting to permit the officers to swab their cheeks for DNA, telling them they would be free to go after being swabbed. Defendant Brou or Defendant Stewart asked Defendant Rivera, their superior officer who by then was on scene, if they were permitted to obtain the DNA without attempting to contact the children's parents. Defendant Rivera responded yes and authorized the warrantless search and seizure of P.D.'s DNA without parental notification or consent. Although

Defendant Rivera had an opportunity to intercede to prevent the warrantless search and seizure of P.D.'s DNA without parental notification or consent, he did not do so.

29. P.D. observed the other four youths sign the forms and get released after having their cheeks swabbed by Defendant Officers. Defendant Brou or Defendant Stewart then pulled P.D. from the police car, uncuffed him, and gave him a form to sign. P.D. signed the form under compulsion of official authority without understanding the consequences of allowing SDPD to seize and indefinitely store his DNA.

30. Defendant Officers did not did not seek, much less obtain, a warrant for searching P.D. and seizing his DNA, did not inform P.D. that he could consult his parents before signing, and did not make any effort to explain the consequences of handing his entire genetic code over to the City for indefinite storage. Defendant Officers did not notify, attempt to notify, or obtain the consent of P.D.'s mother and co-Plaintiff Ms. Wilson prior to seizing his DNA.

31. P.D. was not subject to any form of probation, parole, of other supervised status or court order that justified taking his DNA without a warrant. No other ground existed on which P.D. could be legally compelled to submit a sample of his body tissue for DNA analysis, storage, or use for law enforcement purposes.

32. Based on Defendant Rivera's authorization, after P.D. signed the form, Defendant Stewart or Defendant Brou swabbed inside P.D.'s cheek for DNA, re-cuffed him, and put him back in the police car. A significant period of time had passed since the children had been initially stopped.

33. Children "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them" and "are more vulnerable or susceptible to ... outside pressures" than adults. *J.D.B. v. North Carolina*, 564 U.S. 261, 272–73 (2011) (internal citations and quotations omitted).

In the context of police custody, "'events that would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.'" *Id.* (quoting *Haley v. Ohio*, 332 U.S. 596, 599 (1948)). "[T]hese observations restate what any parent knows—indeed, what any person knows—about children generally." *Id.* (internal citation and quotation omitted).

34. "Even if an adolescent has an 'adult-like' capacity to make decisions, the adolescent's sense of time, lack of future orientation, labile emotions, calculus of risk and gain, and vulnerability to pressure will often drive him or her to make very different decisions than an adult would in similar circumstances." Kenneth J. King, *Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children from Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights*, Wis. L. Rev. 431, 436 (2006). For these reasons, a minor "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions… without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself." *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962).

35. Due to the inherently coercive circumstances of his detention as a juvenile by numerous police officers, P.D. did not give free and voluntary consent to the taking of tissue samples for purposes of DNA collection or analysis or any other purpose. Ms. Wilson did not give consent on behalf of P.D. and did not have an opportunity to advise P.D. in his decision to allow SDPD to take his DNA. If she had been consulted, she would have advised P.D. not to provide his DNA without a warrant or court order. P.D. would not have signed the "consent" form if he had had the opportunity to consult with his mother prior to signing.

36. Defendant Officers were aware that P.D. was a minor and that officers among them were seeking tissue samples from P.D. for the purpose of DNA collection and analysis. To the extent any officer named in this complaint did not

directly participate in taking tissue samples from P.D. for DNA collection and analysis, each such officer had a realistic opportunity to intercede and prevent such taking of tissue samples from P.D.

37. After having his DNA extracted, P.D. was booked into custody. Defendant Barrera, a detective from the homicide unit, and another officer interrogated him for 1-2 hours outside the presence of his parents or counsel, during which time they, among other indignities, told him that he attends a school for people who "fuck up" and are "not successful," called him an "underperforming person," repeatedly stated that he came from a "broken home," and told him that he "ain't shit." Defendants then sent P.D. to juvenile hall, where he remained confined for juvenile court proceedings. Defendants did not notify Ms. Wilson of P.D.'s arrest until after the interrogation was over, and never notified her of the taking of his DNA.

*Juvenile Court Proceedings*

38. On April 4, 2016, the San Diego District Attorney filed various charges against P.D. in juvenile court related to the unloaded revolver obtained as the fruit of an unlawful search. P.D. remained in juvenile hall until April 8, 2016, when the juvenile court ordered his release on home supervision.

39. On June 27, 2016, after conducting a hearing in which Defendants Brou and Stewart testified, the juvenile court granted P.D.'s motion to suppress the evidence of the revolver as the fruit of an unlawful search that violated P.D.'s Fourth Amendment rights. The court had "a problem with the actual detention right off the bat of five people just walking in the park."

40. On July 22, 2016, the juvenile court dismissed the charges against P.D. The order dismissing the case contains no order that Defendants destroy P.D.'s DNA sample or any DNA profile and copies thereof created from that sample.

41. As a result of Defendants' abovementioned actions, Plaintiffs have suffered and continue to suffer damages and severe emotional distress, including but not limited to nightmares, inability to sleep, and anxiety requiring medical care.

*The City's Juvenile DNA Policy*

42. SDPD policy permits the police to obtain a child's DNA without a warrant for investigative purposes – regardless of whether he or she is even under arrest – through his or her supposed consent. *See* SDPD Policy 3.08, Sec. XIII.C (attached hereto as Exhibit 1 and incorporated herein by reference); SDPD Order # 09-14 (attached hereto as Exhibit 2 and incorporated herein by reference) (collectively "the Policy" or "Juvenile DNA Policy"). The Policy makes no mention of the particular vulnerabilities of minors and contains no protections to ensure a child's consent is given knowingly and voluntarily. The Policy permits officers to obtain a minor's consent in the same manner that they obtain an adult's consent, and it does not require notification to the parent prior to consent being given.

43. California's DNA and Forensic Identification Database and Data Bank Act of 1988, Cal. Penal Code § 295 *et. seq*. ("DNA Act"), governs the compulsory taking of DNA for inclusion in California's statewide DNA database. The City's Juvenile DNA Policy correctly recognizes that the DNA Act forbids the compulsory seizure of a juvenile's DNA for inclusion in the statewide databank, unless the minor has been adjudicated guilty of a felony.

44. However, SDPD maintains its own *local* DNA databank, which purports to sidestep the restrictions of the DNA Act. According to the Juvenile DNA Policy, DNA that is seized for investigative purposes can be stored in this local databank without running afoul of the DNA Act, which only governs DNA seizures for inclusion in the statewide database. Specifically, the Juvenile DNA Policy permits law enforcement personnel to obtain DNA samples from children if they "*obtain consent from the suspected subject(s)*, obtain a search warrant, or

obtain a court order." Exh. 2 at 45 (emphasis added). When obtaining consent, "[o]fficers shall fill out the 'Consent to Collect Saliva Sample' form and obtain the signature of the juvenile." Exh. 1 at 37, Exh. 2 at 46; *see also* SDPD DNA Consent Form (attached hereto as Exhibit 3 and incorporated herein by reference).

45. The Policy does not require parental notification *prior* to seeking a child's consent, instead requiring parental notification only *after* a sample has been taken. Exh. 1 at 37; Exh. 2 at 47. Investigative DNA collection from minors is to occur "in the field or at the police station." Exh. 1 at 36.

46. While the policy permits DNA extraction from a juvenile under 14 years old only if "the juvenile knew what he/she did was wrong" – a determination the officer presumably makes in his or her own unfettered discretion – there is no similar qualifying phrase for children over 14. Exh. 1 at 37. The Policy otherwise treats the consent of a minor, including a detained minor, no differently than the consent of an adult, despite the fact that "[o]ur history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults." *J.D.B.*, 564 U.S. at 274 (2011) (internal citation and quotation omitted).

47. The Policy contains no provision limiting "consensual" DNA collection to any particular class of juveniles. It therefore purports to authorize "consensual" DNA samples from juveniles who are arrested for felonies or misdemeanors, for juveniles who are merely being detained such as P.D.'s friends, and even for juveniles who are witnesses or bystanders, so long as the DNA is collected for investigative purposes.

48. The Policy contains no limitations or protections regarding when and under what circumstances the DNA may be searched, what portions of the DNA may be searched, what purposes a DNA search may serve, whether DNA may be shared with other agencies, or how long DNA will be retained. The Policy also contains no prohibition or limitation on "familial" or "partial-match" DNA searches, described in more detail below.

*The Nature of DNA and DNA Profiles*

49. DNA (an abbreviation for "deoxyribonucleic acid") is the cellular material that contains each person's unique genetic code. In the context of law enforcement investigations, DNA samples are normally taken and then analyzed in order to generate DNA profiles.

50. The DNA profiles currently stored in law enforcement databases are sometimes referred to as "DNA fingerprints." This is a misnomer, because the seizure, banking, and analysis of DNA samples differs fundamentally from the mere taking of a fingerprint.

51. Fingerprinting involves the creation of an image or impression of the external physical conformation of the fingertips, and a fingerprint reveals nothing more about the person than the unique patterns of the skin of his or her fingertips. Thus, while fingerprints can be used effectively to provide evidence of the identity of a person, they reveal no other information about that person.

52. DNA, in contrast, is a microscopic arrangement of chemical constituents within the nucleus of a human cell that make up an individual's genetic blueprint. DNA analysis can reveal a vast array of highly private information, including familial relationships and other physical characteristics, as well as propensity to certain diseases, such as sickle-cell anemia, Huntington's disease, and certain types of cancers. The amount of information that can be interpreted about a person based on his or her DNA is expanding every year; some scientists have suggested that DNA analysis can be used to predict personality traits, propensity for antisocial behavior, and an ever-expanding variety of existing and future health conditions and other physical traits.

53. Having a DNA profile in a law enforcement database can lead to significant risk of harm, regardless of whether an individual has committed a crime. For instance, in November 2012, Lukis Anderson was arrested and charged with

murder based on his DNA matching DNA at a crime scene.[1] It was later proven that Mr. Anderson was innocent, and that his DNA was likely at the crime scene because the same paramedics who responded to the crime scene had treated Mr. Anderson earlier in the day. Mr. Anderson spent more than five months in jail with a death sentence hanging over his head, with the error only discovered because he was fortunate enough to have an airtight and well-documented alibi. Not all individuals whose DNA is stored by government entities are so fortunate.

54. California authorizes the use of state and federal DNA databases for so-called "familial searching" or "partial-match" searching – where the database is used to locate a person who does not match the crime-scene sample but whose DNA is similar to that left at the scene – in which a near-match to a forensic DNA sample may belong to a close genetic relative of the perpetrator. Thus, rather than using the database to identify the culprit, DNA is used to single out an individual who is demonstrably innocent of the crime – because the crime scene DNA does not match his – in the hope that investigating this innocent person will provide a clue to the identity of the actual culprit. In turn, if a familial DNA search results in a "hit," then that will inevitably lead to law enforcement investigation of numerous family members to rule them out as suspects, solely for being related to a demonstrably innocent person whose DNA may be in the database for any number of reasons, including based on invalid consent. This represents an unreasonable intrusion into the private lives of countless individuals who have not even been accused of any crime and who may or may not be related to the perpetrator.

55. Due to the expansive nature of the information that can be gleaned from an individual's DNA, the seizure of biological material from P.D. for the purpose of constructing P.D.'s DNA profile provides Defendants with direct access

[1] *See, e.g.*, Osagie Obasogie, *High-Tech, High-Risk Forensics*, N.Y. TIMES, July 24, 2013, http://www.nytimes.com/2013/07/25/opinion/high-tech-high-risk-forensics.html (last visited Feb 10, 2017).

to the most fundamentally private personal information that any person possesses. Such seizure invades a location – the genetic code locked within each person's cells – in which, absent unusual circumstances, the average person has the very highest expectation of privacy. This risk is demonstrably heightened when there are no protections in place to guard against abuse, such as with the City's Juvenile DNA Policy, which exploits a loophole in the protections of state law in a manner that invites abuse.

*P.D.'s DNA Sample*

56. On information and belief, P.D.'s DNA sample was used to create a DNA profile that was entered into the City's local DNA database.

57. The taking, analyzing, and storing of P.D.'s DNA constitutes the type of search and seizure that the United States and California Constitutions permit government entities to conduct only upon the issuance of a warrant, where there exists individualized probable cause to suspect that the person has committed a serious offense, or upon legally valid consent.[2]

58. On information and belief, the DNA swab taken from P.D. was analyzed by the SDPD's Forensic Science Laboratory pursuant to City and SDPD policy, custom, and/or practice. On information and belief, the City continues to retain portions of the DNA sample taken from P.D. that remain after the analysis conducted by the Forensic Science Laboratory.

59. On information and belief, P.D.'s unique DNA information was entered into the City's local DNA databank or otherwise retained by SDPD. On information and belief, the City continues to retain such information, even though charges against P.D. stemming from his arrest were dismissed.

[2] Although "exigent circumstances" can create an exception to the warrant requirement in other circumstances, the Juvenile DNA Policy itself correctly acknowledges that "[e]xigent circumstances will be virtually non-existent in most [DNA] cases because DNA is a hereditary material in humans that does not change over time." Exh. 2 at 45.

60. The taking, analyzing, and storing of P.D.'s DNA and the creation and searching of his DNA profile violated and continues to violate the Fourth Amendment to the U.S. Constitution, Article I, §§ 1, 13 of the California Constitution, and/or California law.

61. On September 27, 2016, Plaintiffs submitted a claim for damages to the City. The claim was delivered on September 28, 2016. A true and correct copy of the claim is attached hereto as Exhibit 4 and incorporated herein by reference.

62. On December 1, 2016, the City denied the claim. A true and correct copy of the denial is attached hereto as Exhibit 5 and incorporated herein by reference.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of 42 U.S.C. § 1983 – Unreasonable Search and Seizure for Stop-and-Frisk
### (Against Defendants Brou, Stewart, Barrera, and Does 1-10)

63. The allegations contained in paragraphs 1 through 62, inclusive, are hereby incorporated by reference.

64. By unlawfully detaining P.D. without reasonable suspicion and by frisking and searching him and his bag without a reasonable belief that he was armed and dangerous, Defendants Brou and Stewart violated P.D.'s Fourth Amendment right to be secure in his person and property against unreasonable searches and seizures.

65. By directing officers Brou and Stewart to detain P.D. without reasonable suspicion, Defendant Barrera authorized and was a direct participant in the violation of P.D.'s Fourth Amendment right to be secure in his person and property against unreasonable searches and seizures.

66. By failing to intercede to prevent the unlawful searches and seizures, Defendants Brou, Stewart, Barrera, and Does 1-10 violated P.D.'s Fourth

Amendment right to be secure in his person and property against unreasonable searches and seizures.

67. As a proximate and foreseeable result of the violations of the abovementioned violations of P.D.'s Fourth Amendment rights, Plaintiffs have suffered, are suffering, and will continue to suffer injuries, including but not limited to continued invasion of privacy, humiliation, emotional distress, anxiety, stigma, and embarrassment.

**SECOND CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1983 – Unreasonable Search and Seizure of DNA**
**(Against Defendants Brou, Stewart, Rivera and Does 1-10)**

68. The allegations contained in paragraphs 1 through 67, inclusive, are hereby incorporated by reference.

69. By unlawfully taking a tissue sample containing P.D.'s DNA without a warrant, valid consent, or exigent circumstances, and/or by authorizing or failing to intercede to prevent such unlawful collection, Defendants Brou, Stewart, Rivera and Does 1-10 violated P.D's Fourth Amendment right to be secure in his person against unreasonable searches and seizures.

70. As a proximate and foreseeable result of the abovementioned unconstitutional acts or omissions, P.D.'s DNA was subjected to analysis by SDPD personnel without a warrant, valid consent, or exigent circumstances, in violation of his Fourth Amendment rights.

71. As a proximate and foreseeable result of the abovementioned violations of P.D.'s Fourth Amendment rights, P.D.'s DNA sample and/or profile have been, and continue to be, in the possession of government agencies including but not necessarily limited to SDPD, resulting in a continuing violation of his Fourth Amendment rights.

72. As a proximate and foreseeable result of the abovementioned violations of P.D.'s Fourth Amendment rights, Plaintiffs have suffered, are suffering, and will continue to suffer injuries, including but not limited to continued

invasion of privacy, humiliation, emotional distress, anxiety, stigma, and embarrassment.

**THIRD CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1983 – Unreasonable Search and Seizure of DNA**
**(Against Defendant City)**

73. The allegations contained in paragraphs 1 through 72, inclusive, are hereby incorporated by reference.

74. In violating P.D.'s Fourth Amendment rights, Defendant Officers acted pursuant to expressly adopted written policy and/or longstanding practice of the City to obtain DNA samples for investigative purposes from minors who have not been adjudicated guilty of any felony, based solely on a minor's purported consent, which, as a matter of written policy as well as practice and/or custom is obtained no differently than the consent of an adult and without parental consent.

75. The City's Policy fails to account for the particular vulnerabilities of minors in providing involuntary consent under inherently coercive conditions, and the City failed to adequately train its police officers to properly obtain knowing and voluntary consent for a DNA sample from a juvenile.

76. The Juvenile DNA Policy, both independently and coupled with a failure to provide adequate training on those issues, caused Defendant Officers to deprive P.D. of his Fourth Amendment rights.

77. On information and belief, one or more SDPD employee(s) analyzed P.D.'s DNA in the Department's Forensic Science Laboratory without a warrant, valid consent, or exigent circumstances, pursuant to the City's custom, practice, and/or policy, and without restriction on familial or partial-match searching, in violation of Plaintiffs' Fourth Amendment rights. The City of San Diego continues to retain said samples and/or profiles pursuant to its custom, practice, and/or policy, in violation of Plaintiffs' Fourth Amendment rights.

## FOURTH CAUSE OF ACTION
## Violation of 42 U.S.C. § 1983 – Violation of Rights to Familial Association and Due Process
## (Against Defendants City, Brou, Stewart, Rivera and Does 1-10)

78. The allegations contained in paragraphs 1 through 77, inclusive, are hereby incorporated by reference.

79. In obtaining P.D.'s DNA sample without valid consent and without prior notification to his mother, and/or by authorizing or failing to intercede to prevent such unlawful collection, Defendants Brou, Stewart, and Barrera deprived P.D. of his liberty interest in parental advice and parental decision-making regarding his decision whether to allow Defendants to take, indefinitely store, and search his DNA, without due process, in violation of his Fourteenth Amendment rights.

80. In obtaining P.D.'s DNA sample without providing Plaintiff Wilson notification and an opportunity to be heard prior to P.D.'s supposed consent, and/or by authorizing or failing to intercede to prevent such unlawful collection, Defendants Brou, Stewart, Rivera, and Does 1-10 deprived Ms. Wilson of her liberty interest in counseling her child in important decisions, such as the decision whether to allow Defendants to take, indefinitely store, and search P.D.'s DNA, without due process in violation of her Fourteenth Amendment rights.

81. SDPD policy caused the violation of Plaintiffs' due process and familial association rights under the Fourteenth Amendment, because Defendants Brou, Stewart, Rivera and Does 1-10 acted pursuant to the Juvenile DNA Policy. Therefore the City is also liable for the violations of Plaintiffs' due process rights.

## FIFTH CAUSE OF ACTION
## Violation of 42 U.S.C. § 1983 – Violation of Equal Protection
## (Against Defendants Brou, Stewart, and Barrera)

82. The allegations contained in paragraphs 1 through 81, inclusive, are hereby incorporated by reference.

83. By relying on race as a motivating factor in deciding to detain P.D., Defendants Brou, Stewart, and Barrera engaged in racially discriminatory policing, and thereby violated P.D.'s Fourteenth Amendment right to equal protection under the law.

84. As a proximate and foreseeable result of Defendants' violations of P.D.'s Fourteenth Amendment rights, Plaintiffs have suffered, are suffering, and will continue to suffer injuries, including but not limited to continued invasion of privacy, humiliation, emotional distress, anxiety, stigma, and embarrassment.

**SIXTH CAUSE OF ACTION**
**Violation of Cal. Const. Art. I, § 13 – Unreasonable Search and Seizure for Stop-and-Frisk**
**(Against Defendants Brou, Stewart, Barrera, and Does 1-10)**

85. The allegations contained in paragraphs 1 through 84, inclusive, are hereby incorporated by reference.

86. As a California citizen, P.D. has a right to be secure in his person and property against unreasonable searches and seizures, recognized under the California Constitution, Art. I, § 13.

87. By unlawfully detaining P.D. and/or by failing to intercede to prevent such unlawful detention, Defendants Brou, Stewart, Barrera, and Does 1-10 violated his right under Art. I, § 13 to be secure in his person and property against unreasonable searches and seizures.

**SEVENTH CAUSE OF ACTION**
**Violation of Cal. Const. Art. I, § 13 – Unreasonable Search and Seizure of DNA**
**(Against Defendants City, Brou, Stewart, Rivera, and Does 1-10)**

88. The allegations contained in paragraphs 1 through 87, inclusive, are hereby incorporated by reference.

89. By extracting P.D.'s DNA without a warrant, valid consent, or exigent circumstances, and/or by authorizing or failing to intercede to prevent such unlawful collection, Defendants Brou, Stewart, Rivera, and Does 1-10 violated

P.D.'s right under Art. I, § 13 to be secure in his person against unreasonable searches and seizures. By unlawfully analyzing P.D.'s DNA without a warrant, valid consent, or exigent circumstances, Defendant City and Does 1-10 violated Plaintiffs' rights under Art. I, § 13.

90. As a proximate and foreseeable result of Defendants' violations of Plaintiffs' rights under Art. I, § 13, P.D.'s DNA samples and/or profiles have been, and continue to be, in the possession of Defendant City, resulting in an ongoing violation of those rights.

**EIGHTH CAUSE OF ACTION**
**Violation of Cal. Const. Art. I, § 1 – Right of Privacy**
**(Against Defendants City, Brou, Stewart, Rivera, and Does 1-10)**

91. The allegations contained in paragraphs 1 through 90, inclusive, are hereby incorporated by reference.

92. As a California citizen, P.D. has a legally protected privacy interest in his bodily integrity and biological and genetic profile information, which is recognized as an inalienable right under the California Constitution, Article I, § 1.

93. P.D. has a reasonable expectation of privacy in his bodily integrity and biological and genetic profile information, as contained in his DNA. P.D. has a reasonable expectation of privacy not to have his DNA extracted in public view.

94. By unlawfully collecting P.D.'s DNA without a warrant, valid consent, or exigent circumstances while he was detained in a public park, and/or by authorizing or failing to intercede to prevent this collection, Defendants Brou, Stewart, Rivera, and Does 1-10 committed a serious invasion of his privacy interests.

95. By analyzing P.D.'s DNA sample without a warrant, valid consent, or exigent circumstances, Defendants City and Does 1-10 committed a serious invasion of his privacy interests.

96. As a proximate and foreseeable result of the abovementioned violations of P.D.'s privacy rights under Art. I, § 1, P.D.'s DNA sample and/or profile has been, and continues to be, in the possession of government agencies including the SDPD.

97. None of the foregoing serious invasions of privacy was justified by any legitimate countervailing interest, and even if Defendants had legitimate countervailing interests, there were feasible and effective alternatives to Defendants' conduct that would have had lesser impact on privacy interests.

**NINTH CAUSE OF ACTION**
**Cal. Civil Code § 52.1 Civil Rights Violations – Bane Act**
**(Against Defendants Brou, Stewart, Barrera, and Does 1-10)**

98. The allegations contained in paragraphs 1 through 97, inclusive, are hereby incorporated by reference.

99. The acts alleged above constituted an unlawful seizure, in violation of P.D.'s rights guaranteed by the Fourth Amendment of the United States Constitution and Article I, § 13 of the California Constitution.

100. In committing these acts, Defendants Brou, Stewart, Barrera, and Does 1-10 interfered or attempted to interfere by threats, intimidation, or coercion with the exercise or enjoyment by P.D. of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state.

101. P.D. reasonably believed that Defendants Brou, Stewart, Barrera, and/or Does 1-10 would commit violence against him if he exercised his right to be free from unreasonable seizures, and the conduct of Defendants Brou, Stewart, Barrera, and Does 1-10 was a substantial factor in causing him harm.

**TENTH CAUSE OF ACTION**
**Cal. Civil Code §§ 51.7, 52– Ralph Act**
**(Against Defendants Brou, Stewart, and Barrera)**

102. The allegations contained in paragraphs 1 through 101, inclusive, are hereby incorporated by reference.

103. Defendants Brou, Stewart, and Barrera subjected P.D. to violence or threat of violence when they detained him, cuffed him, and searched him.

104. A motivating reason for the conduct of Defendants Brou, Stewart, and Barrera was their perception of P.D.'s race, and their conduct was a substantial factor in causing P.D. harm.

**ELEVENTH CAUSE OF ACTION**
**False Arrest/False Imprisonment**
**(Against Defendants Brou, Stewart, Barrera, and Does 1-10)**

105. The allegations contained in paragraphs 1 through 104, inclusive, are hereby incorporated by reference.

106. By the acts alleged herein, particularly the act of detaining P.D. without his consent, an arrest warrant, probable cause or reasonable suspicion, for an appreciable period of time, Defendants Brou, Stewart, Barrera, and Does 1-10 falsely arrested and/or falsely imprisoned P.D., and/or authorized the false arrest and/or false imprisonment.

107. Defendants Brou, Stewart, Barrera, and Does 1-10 thereby set in motion about six days of detention prior to arraignment based on an unlawful seizure.

108. As a proximate and foreseeable result of these acts, Plaintiffs have suffered, are suffering, and will continue to suffer injuries, including but not limited to continued invasion of privacy, humiliation, emotional distress, anxiety, stigma, and embarrassment.

**TWELFTH CAUSE OF ACTION**
**Conversion/Claim and Delivery**
**(Against Defendants City, Brou, Stewart, Rivera, and Does 1-10)**

109. The allegations contained in paragraphs 1 through 108, inclusive, are hereby incorporated by reference.

110. P.D. owns and/or has the right to possess the tissue samples unlawfully taken from him, as well as any information derived from said samples.

111. Defendants Brou, Stewart, Rivera, and Does 1-10 unlawfully took tissue samples from P.D., and Defendant City is unlawfully retaining said samples and any information derived from said samples.

112. Defendants Brou, Stewart, Rivera, and Does 1-10 acted and continue to act within the scope of their employment when they detained P.D., seized his tissue samples, created a DNA profile from his tissue samples, and maintained possession of his tissue samples and DNA profile.

113. California Government Code section 815.2 authorizes the vicarious liability of Defendant City for injuries proximately caused by the acts of Defendants Brou, Stewart, Rivera, and/or Does 1-10 within the scope of their employment if those acts give rise to a cause of action against Defendants Brou, Stewart, Rivera, and/or Does 1-10.

114. P.D. has the right to immediate possession of the tissue samples unlawfully taken from him, as well as any information derived from said samples.

## THIRTEENTH CAUSE OF ACTION
## Trespass to Chattels
## (Against Defendants City, Brou, Stewart, Rivera, and Does 1-10)

115. The allegations contained in paragraphs 1 through 114, inclusive, are hereby incorporated by reference.

116. P.D. owns and/or has the right to possess the tissue samples unlawfully taken from him, as well as any information derived from said samples.

117. Defendants Brou, Stewart, Rivera, and Does 1-10 intentionally interfered with P.D.'s use or possession of P.D.'s tissue samples when they seized tissue samples from P.D., and Defendant City is intentionally interfering with P.D.'s use or possession of his tissue samples by retaining said samples and any information derived from said samples so that they may subject to search in the future.

118. P.D. did not provide knowing and voluntary consent to the taking of his tissue samples.

119. Defendants' intentional conduct was and continues to be a substantial factor in causing harm to P.D., including but not limited to continued invasion of privacy, humiliation, emotional distress, anxiety, stigma, and embarrassment.

120. Defendants Brou, Stewart, Rivera, and Does 1-10 acted and continue to act within the scope of their employment when they detained P.D., seized his tissue samples, created a DNA profile from his tissue samples, and maintained possession of his tissue samples and DNA profile.

121. California Government Code section 815.2 authorizes the vicarious liability of Defendant City for injuries proximately caused by the acts of Defendants Brou, Stewart, Rivera, and/or Does 1-10 within the scope of their employment if those acts give rise to a cause of action against Defendants Brou, Stewart, Rivera, and/or Does 1-10.

122. P.D. has the right to immediate possession of the tissue samples unlawfully taken from him, as well as any information derived from said samples.

## VI. PRAYER FOR RELIEF

Plaintiffs respectfully pray for relief as follows:

1. For a declaratory judgment that the acts and omissions of Defendants, and each of them, violated P.D.'s rights under the Fourth and Fourteenth Amendment to the United States Constitution, Art. I, §§ 1, 13 of the California Constitution, Cal. Civil Code §§ 51.7, 52, 52.1, and/or California common law, and violated Ms. Wilson's rights under the Fourteenth Amendment to the United States Constitution;

2. For a permanent injunction compelling Defendants to return any of P.D.s' DNA samples they may retain, to expunge all copies of P.D.s' DNA profiles from all records in which they are kept, to notify P.D. of any other agencies or databases with which his DNA samples or profiles have been shared, and to take action to ensure that all copies of P.D.s' DNA samples or profiles contained within any such other agencies or databases be destroyed or expunged;

3. For a permanent injunction compelling Defendants to make reasonable efforts to locate everyone whose DNA was obtained by purported juvenile consent pursuant to the City's Juvenile DNA Policy, to return any samples they may retain, and to expunge all copies of any DNA profiles that were created using these samples;

4. For a declaratory judgment that the City's Juvenile DNA Policy violates the Fourth and Fourteenth Amendments of the United States Constitution and/or Article I, §§ 1, 13 of the California Constitution and is therefore invalid on its face;

5. For a permanent injunction forbidding the enforcement of the City's Juvenile DNA Policy and forbidding SDPD officers from obtaining DNA from minors without a judicial order, warrant, or parental consent;

6. For a declaratory judgment that the City's Juvenile DNA Policy caused a violation of Plaintiffs' rights under the Constitution of the United States and the Constitution and laws of California;

7. For compensatory, punitive, and statutory damages under 42 U.S.C. § 1983 and applicable California law against Defendants, and each of them, in an amount to be proven at trial, except no punitive damages are sought against the City of San Diego;

8. For costs of suit and attorneys' fees as required or authorized by applicable law, including but not necessarily limited to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, Cal. Civ. Code § 52.1, and/or Cal. Code Civ. Proc. § 1021.5;

9. For all other relief the court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: May 4, 2017

By: /s/ Bardis Vakili
BARDIS VAKILI

Attorney for Plaintiffs

*P.D. v City of San Diego, et al*

## EXHIBITS TO SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS


| EXHIBIT | DOCUMENT | PAGES |
|---|---|---|
| 1 | SDPD Policy 3.08 | 28-45 |
| 2 | SDPD Order # 09-14 | 46-50 |
| 3 | SDPD DNA Consent form | 51-54 |
| 4 | Claim for damages, 9/27/2016 | 55-60 |
| 5 | City claim denial letter, 12/01/2016 | 61-62 |

# EXHIBIT 1
# TO SECOND
# AMENDED
# COMPLAINT

## P.D. v City of San Diego, et al
## SDPD Policy 3.08

**SAN DIEGO POLICE DEPARTMENT**
**PROCEDURE**

| | |
|---|---|
| **DATE:** | FEBRUARY 13, 2015 |
| **NUMBER:** | 3.08 - INVESTIGATIONS |
| **SUBJECT:** | JUVENILE PROCEDURES |
| **RELATED POLICY:** | 3.08 |
| **ORIGINATING DIVISION:** | JUVENILE ADMINISTRATION |
| **NEW PROCEDURE:** | ☐ |
| **PROCEDURAL CHANGE:** | ■ |
| **SUPERCEDES:** | DP 3.08 – 03/07/2014 |

## I. PURPOSE

This Department procedure establishes guidelines for the custody, care, and disposition of juvenile offenders.

## II. SCOPE

This procedure applies to all members of the Department.

## III. BACKGROUND

The "Juvenile Law" section contained in the Welfare and Institutions Code is primarily concerned with the protection of the juvenile offender. However, the law also recognizes the need to protect the public from criminal conduct by minors and to impose upon minors a sense of responsibility for their own acts. In carrying out this intent, the law recognizes that detention is sometimes necessary.

A. Peace officers have the following legal alternative dispositions for juveniles taken into temporary custody, per Welfare and Institutions Code §626:

1. Release the juvenile to a parent, guardian, responsible adult, or on their own recognizance;

2. Refer or deliver the juvenile to an agency for shelter, care, counseling, or diversion. (For diversion cases, refer to the JST operations manual);

3. Complete a Juvenile Contact Report (ARJIS-8) with a statement of the reasons the minor was taken into custody and immediately release the juvenile; or,

4. Deliver the juvenile to a probation officer (Juvenile Hall).

B. Welfare and Institutions Code §626 specifies that the disposition selected should be the one that least restricts the minor's freedom of movement, provided it is in the best interest of the minor and the community.

## IV. DEFINITIONS

A. JCR – Juvenile Contact Report (ARJIS-8).

B. JST – Juvenile Services Team.

C. Law Enforcement Facility – includes a police facility, but does not include a jail.

D. Minor – a term meaning the same as juvenile; a person under 18 years of age.

E. Non-secure Detention – the condition in which a juvenile is in temporary custody and the juvenile's freedom of movement is controlled by the staff of the facility, and the juvenile:

1. Is under constant observation and supervision;

2. Is not locked in a room or enclosure; and,

3. Is not physically secured to a cuffing rail or other stationary object.

Example of non-secure detention: The juvenile can free himself of the building in case of fire.

F. Temporary Custody – the condition in which a juvenile is not at liberty to leave.

G. Welfare and Institutions Code § 601 – juveniles subject to the jurisdiction of juvenile court and to adjudication as a ward for refusal to obey orders of parents, for violation of curfew, or truancy (Status Offenses).

H. Welfare and Institutions Code § 602 – juveniles subject to the jurisdiction of the juvenile court and to adjudication as a ward for violation of law or an ordinance defining a crime (Criminal Offenses).

I. WIC – Welfare and Institutions Code.

## V. ARREST

A. Welfare and Institutions Code § 625 details the circumstances in which an officer can take a juvenile into custody. The laws of arrest for juveniles are essentially the same as for adults, with one major exception, an officer may arrest a juvenile for a misdemeanor not committed in his presence, if probable cause exists.

B. Officers should take photographs suitable for line-up purposes and a full set of fingerprints from all juveniles detained for 602 WIC. The officer must complete the "Final Disposition" block on the fingerprint cards, stating the officer's disposition of the juvenile.

C. Officers must fingerprint juveniles arrested on felony charges.

D. The officer will complete three fingerprint cards and attach them to a copy of the JCR. The officer will forward the fingerprint cards and JCR to the assigned JST detective. The detective will determine the disposition and forward the packet to the Juvenile Records Section at MS 726. Records Division personnel will send fingerprint cards to the Sheriff's Department for entry into the local database and to the Department of Justice, Bureau of Criminal Identification, to be entered into Cal-ID. Copies of fingerprint cards are not acceptable.

E. The Watch Commander/Field Lieutenant must approve all Juvenile Hall placements.

F. On weekdays between the hours of 0700 and 1700, when an officer has taken a juvenile into custody and placed him or her in Juvenile Hall, the officer should notify the area JST sergeant of the arrest.

G. Juvenile Hall cannot accept minors under 12 years of age without a judge's approval.

H. Juvenile Hall will accept 18 year olds, until their 19th birthday, with "No Bail" warrants originating in Juvenile Court.

I. Officers should take juveniles with traffic warrants directly to the deputies at Traffic Court. If the arrest occurs after business hours, the juvenile is to be taken to Juvenile Hall. Juvenile Hall will handle the Promise/Order to Appear and will return the juvenile to a parent or guardian.

## VI. ADMONISHMENT

A. In any case where a juvenile, as described in Welfare and Institutions Code § 601 or 602, is taken into temporary custody, the officer must Mirandize the juvenile when it is reasonable and practical to do so, whether or not the officer is going to question the juvenile about the crime for which he or she has been taken into custody, as required in Welfare and Institutions Code § 625.

B. When a juvenile is in police custody (arrest or arrest-like restraint), he/she must be admonished prior to interrogation.

C. If the juvenile is not going to be questioned, officers are not to ask either of the two questions that would lead to a waiver or invocation of the juvenile's rights.

D. The officer must inform the juvenile of the purpose of the arrest, the expected duration, and that it cannot exceed six hours, as required in Welfare and Institutions Code § 207.1 (d)(1) and (2).

## VII. INFRACTION OR MISDEMEANOR FIELD RELEASES

A. Officers may "field release" a juvenile arrested for any infraction or misdemeanor if the juvenile can provide satisfactory evidence of personal identification and the juvenile is a resident of San Diego County.

B. If the juvenile is not a resident of San Diego County, it is not likely they will return for court on an infraction or a misdemeanor; therefore, another disposition is appropriate.

C. To release a juvenile in the field for a non-traffic related offense, a Juvenile Contact Report (ARJIS-8) must be completed. Officers must enter "Field Release" in the field disposition box of the JCR. The officer should contact the juvenile's parent or guardian, advising them of the arrest before the end of shift. If the officer is unable to make contact, the appropriate area JST will do so later.

D. When a school official calls an officer to a school campus to handle a juvenile, the officer must determine if the juvenile has violated the law or if the juvenile has violated a school policy. To maintain the credibility of the school officials and the Police Department, the officer should use discretion in determining the disposition of the juvenile.

E. Officers may not release a juvenile in the field if:

1. The juvenile is under 14 years of age;

2. The juvenile is under the influence of alcohol or drugs;

3. The juvenile requires medical attention or is unable to care for his/her own safety;

4. The crime involves a great deal of criminal sophistication;

5. The immediate release of the juvenile would jeopardize the prosecution of the offense(s); and,

6. There is reasonable likelihood that the offense(s) would continue or resume, or the release of the juvenile would imminently endanger the safety of persons or property.

## VIII. DEPENDENT CHILDREN

A. Dependent children are defined as victims of child abuse, neglect, or molestation, children deserted by their parents, children whose parents have been arrested or hospitalized, or children otherwise in need of immediate protection as detailed in Welfare and Institutions Code § 300.

B. If a child warrants protection, the officer should take the child to Polinsky Children's Center and complete and forward the appropriate report (ARJIS-9) to the Child Abuse Unit.

## IX. POLICE FACILITY DETENTIONS

Secure detention is currently prohibited in all police facilities. Juveniles shall not be locked in a room or enclosure and shall not be secured to a cuffing rail or other stationary object while in custody in a law enforcement facility for any length of time.

A. Non-secure Detention

1. Juveniles under non-secure detention may be handcuffed. However, they shall not be handcuffed to chairs, benches, handcuffing rails or other stationary objects.

2. Juveniles held under non-secure detention shall be under constant observation and supervision by an officer. Observation by television monitor is not sufficient; constant personal observation is required.

3. Juveniles detained under Welfare and Institutions Code § 300 must be kept under continuous supervision and are not permitted to come into contact with adults in custody within the facility, per § 206 WIC.

4. A non-secure detention may not exceed six hours. Juveniles may be held in law enforcement facilities only long enough for officers to investigate a crime, facilitate release of the juvenile to a parent, guardian, responsible relative, or adult designated by the parent. In all cases, within the six-hour limit, officers must use one of the dispositional options available to them. If the juvenile is going to be detained longer than six hours, the officer must transfer the juvenile to Juvenile Hall.

5. Juveniles detained at San Diego Police Department facilities shall not be allowed to come into contact or remain in contact with adult arrestees.

6. Juveniles in custody under Welfare and Institutions Code § 602 shall not be allowed to come into contact with juveniles in custody under Welfare and Institutions Code § 300 or 601.

B. Juveniles under non-secure detention at law enforcement facilities shall have the following amenities available to them:

1. Reasonable access to drinking water and/or other beverage;

2. Reasonable access to toilets and washing facilities;

3. Privacy during visits with family, guardian, and/or lawyer;

4. Provided with something to eat if he or she is in custody for four hours or is otherwise in need of nourishment. This includes any special diet required for the health or medical needs of the minor. If the juvenile has money, he or she should be provided access to facility vending machines. Operational Support provides food items to the area commands for juveniles without money; and,

5. Provided the opportunity to complete at least two telephone calls no later than one hour after being taken into custody. Officers should use discretion in permitting long distance phone calls. Privacy only applies to phone calls to an attorney. The arresting officer should listen in on all other phone conversations.

C. All officers who detain juveniles in a police facility will record the detention date, time in and time out, name and age of juvenile, offense and subsequent disposition, and the arresting officer's name and I.D. number on the standardized automated Juvenile Detention Log maintained on the I: Drive on the Police Department LAN. The arresting officer is responsible for recording this information on the log at the time of the detention.

## X. PROTECTION AND WELFARE OF JUVENILES

A. Protection – the welfare and protection of all juveniles held in temporary custody is the responsibility of arresting officers and this Department.

B. Discipline – discipline of any kind, including withholding any of the amenities noted previously, is not permitted. However, officers are to maintain control of juveniles according to accepted Department procedures.

C. Suicide Risk and Prevention

1. If identified as a suicide risk, officers will maintain constant supervision of the juvenile.

2. A juvenile who exhibits excessive agitation, despondency, or other distressed behavior should be under constant direct supervision of an officer. If the juvenile appears to be potentially suicidal, the juvenile should be taken to:

   Children's Mental Health Services
   Emergency Screening Unit
   730 Medical Center Court
   Chula Vista, California
   (619) 421-6900

3. Juveniles being transported to Juvenile Hall who claim to be suicidal are still accepted at Juvenile Hall. The medical staff at Juvenile Hall will evaluate the juvenile. Juvenile Hall has procedures in place to conduct a "suicide watch" on juveniles who threaten suicide.

D. Use of Restraints

1. Officers are to use discretion and good judgment in the use of physical restraints consistent with procedures outlined in Department Procedure 6.01, Handcuffing, Searching, and Transporting Procedures.

2. A juvenile who exhibits behavior necessitating the use of alternative restraints should be kept under continuous in-person observation for evidence of breathing difficulty or other symptoms of physical distress. A juvenile displaying such symptoms should receive immediate medical treatment.

E. Medical Assistance and Services

1. Officers should comply with any reasonable request for medical assistance.

2. Officers will render necessary medical assistance and/or services.

3. Officers will obtain appropriate medical care for any juvenile who is known to have ingested one or more intoxicating substances or appears to be under the influence of one or more intoxicating substance which could result in a medical emergency.

## XI. REQUIRED REPORTS

A. Officers must complete a Juvenile Contact Report (JCR) after taking a juvenile into custody for a criminal offense.

1. If the juvenile is to be detained at Juvenile Hall, it is important that the JCR, the Declaration and Determination form, Affidavit and Application for Filing of Juvenile Court Petition, and the Crime Case be completed immediately and one copy left with the Juvenile Hall Intake Officer. The Declaration must include a description of the offense and the juvenile's involvement. If the officer does not include the elements of the offense in the reports, Juvenile Hall will immediately release the minor from custody.

2. The only time a Declaration and Determination form, Affidavit and Application for Filing of Juvenile Court Petition, and Crime Case are **not** required is when the juvenile has been arrested for a Juvenile Detention Order or warrant. Officers must explain in the JCR how they initially came into contact with the juvenile.

3. If the juvenile is detained at Juvenile Hall and it is not immediately possible to complete the Crime Case (ARJIS-2), the Crime Case must be taken the next day to the District Attorney's Juvenile Division. All other reports are required before the Intake Officer will accept the juvenile. If the officer is going to submit the Crime Case the following day, the officer must advise the JST detective handling the case.

4. On weekdays, between the hours of 0730 and 1600, the Intake Officer will direct the transporting officer to the District Attorney's Juvenile Division for a review of the reports before booking.

B. Officers may request that the juvenile not be released, but a factual description of the situation must support the request. The request must fall within the provisions of Welfare and Institutions Code § 628 that include situations where:

1. The minor is in need of proper and effective parental care or control and has no parent, guardian, or responsible relative; has no parent, guardian, or responsible relative willing to exercise or capable of exercising such care

or control; or, has no parent, guardian, or responsible relative actually exercising such care or control;

2. Continued detention of the minor is a matter of immediate and urgent necessity for the protection of the minor or a reasonable necessity for the protection of the person or property of another;

3. The minor is likely to flee the jurisdiction of the court;

4. The minor has violated an order of the juvenile court; or,

5. The minor is physically dangerous to the public.

C. If a juvenile has committed multiple traffic or criminal offenses, include all violations on a Juvenile Contact Report.

D. Department personnel should not tell citizens victimized by juveniles to contact the Juvenile Administration Unit to sign a complaint. When a juvenile has broken the law and it is reported to the police, police can take action despite the wishes of the complainant.

E. Parent Notification Letter

1. When an officer determines a juvenile meets the criteria below, he/she will forward a copy of the contact (Field Interview, Traffic Cite, Crime Case, or JCR information where the juvenile is listed as a companion only) to the Juvenile Services Team in the area in which the juvenile lives. This will assist the parent in seeking help and allow for community-neighborhood intervention and assistance.

2. The juvenile meets the criteria when he or she is:

a. A companion of a person interviewed, cited, or arrested for a narcotics violation (possession, under the influence, sales, transportation);

b. A companion of a person interviewed, cited or arrested for an alcohol violation (open container, DUI, drunk in public, furnishing alcohol to a minor, minor in possession of alcohol);

c. A companion of a person involved in criminal activity where that person is listed as a suspect, cited, or arrested for a crime. (Do not send a letter if doing so will jeopardize an ongoing investigation); or,

d. A companion of a person known to be a member of a street gang.

3. The Juvenile Services Team Sergeant will evaluate the contact and make the decision to have a "Parent Notification Letter" sent to the juvenile's parents/legal guardian. A tracking system will be implemented to evaluate the effectiveness of the notification letter. Tracking will consist of the date the letter was sent, date the parent or guardian contacted Juvenile Services at the command, the outcome of the parent/guardian contact, and any future contacts with law enforcement. The Juvenile Administration will compile data from the area commands to determine the effectiveness of the program.

4. When a parent/guardian contacts the area command Juvenile Services Team, the parent/guardian will be provided necessary intervention referrals for the identified high-risk behaviors. Information regarding the nature of the contact will be provided to the parent/guardian. The names of the other individuals involved with the juvenile during the contact will not be shared to preserve their privacy. The focus will be only the behaviors of that particular child and possible ways to help prevent future contacts with law enforcement. The number of notifications to a parent/guardian regarding the high-risk behaviors of their child will be at the discretion of the Juvenile Services Team Sergeant. After the first notification without contact from the parent/guardian, subsequent contacts will be evaluated by the Juvenile Services Team Sergeant to determine an appropriate course of action that could include sending an additional letter or initiating personal contact.

## XII. PHOTOGRAPHING JUVENILES

A. The policy of the San Diego Police Department in regards to taking photographs of individuals is the same for juveniles and adults. An officer may photograph a person either in the field or at a police station under the following conditions:

1. The person is under arrest for a crime;

2. The person is being detained as a suspect in a particular crime;

3. The person is being legally detained for a criminal investigation; or,

4. The person consents to being photographed.

B. An officer who photographs a juvenile will notify the parent or guardian that photos were obtained. If photographs are obtained subsequent to a custodial arrest, the officer will include notification information in the JCR. If photographs are taken during a FI, the officer will include notification information in the "Comments" section of the FI form. Notification information includes the date

and time of notification, as well as the name and telephone number of the person notified.

C. If officers are unable to make parental notification, officers will include this in the JCR or FI. Notification then becomes the responsibility of the area JST detective. If the detective is unable to make contact by telephone, he or she will complete and mail a copy of the "Parental Notification, Photographing of Juvenile" form to the juvenile's home address of record.

D. The "Parental Notification, Photographing of Juvenile" form can be located on the LAN system at F:\Templates\Investigative Reports\Parental Notification. Print a copy of this form and fill in the necessary information.

## XIII. COLLECTION OF DNA MOUTH SWABS FROM JUVENILES

A. Deoxyribonucleic acid (DNA) collection is a useful law enforcement tool for identifying and prosecuting criminal offenders and exonerating the innocent. The collection of DNA evidence plays an important role in solving a wide variety of crimes.

B. Only under specific circumstances can a juvenile's DNA be taken and submitted to a state DNA databank. This procedure will generally be performed by a probation officer within Juvenile Hall, and in conjunction with a court order. Refer to Penal Code § 296 (a)(1) and (3) for further details.

C. A juvenile's DNA can be taken and stored in the San Diego Police Department's own databank, if obtained legally and for investigative purposes. An officer may take mouth swab samples from a juvenile for investigative purposes, either in the field or at a police station, under the following conditions:

1. The juvenile is being legally detained as a suspect in a criminal investigation;

2. If the juvenile is in a place of confinement, immediate steps must be taken to notify the juvenile's parent, guardian, or a responsible relative that the minor is in custody and the location in which the minor is being held, per Welfare and Institutions Code § 627. The means of notification should be noted on the JCR. When a parent or guardian cannot be notified, an explanation must be included on the JCR;

3. The juvenile has been identified and the means by which he/she was identified (i.e., school identification card, passport, California I.D. card, etc) is documented;

4. A JCR documenting the reasons for the detention and circumstances for the contact is completed; and,

5. To obtain a mouth swab from a juvenile under the age of 14 years, it must be established that the juvenile knew what he/she did was wrong at the time of the commission of the crime. Per California Penal Code § 26, children under the age of 14 are not capable of committing a crime UNLESS there is clear proof that WHEN they committed the crime, they knew its wrongfulness.

D. Prior to collecting a mouth swab, officers will notify their immediate supervisor or contact the field lieutenant for approval. During normal business hours, the officer will contact the detective sergeant assigned to the unit affected (i.e., Sex Crimes, Child Abuse, Juvenile Services Team). After business hours, officers will ensure their immediate supervisor has been notified and briefed on the circumstances, prior to the collection, and obtain approval to collect the sample. Officers must document the approving supervisor's name in the report.

E. Officers shall fill out the "Consent to Collect Saliva Sample" form and obtain the signature of the juvenile. This form must be included in the police report. The consent form will be inside the DNA collection kit or it can be located on the LAN system at F:\Templates\Juvenile Forms\Consent to Collect Saliva Sample and printed.

F. Once approval is obtained, the officer will ensure the mouth sample is obtained in a controlled environment, outside of public view. The officer obtaining the sample will also ensure a witness is present during the collection. The witness officer's information will be documented on the report.

G. Officers will obtain one mouth swab at a time and ensure the process is complete prior to beginning the collection of an additional mouth swab sample.

H. Officers will ensure they follow the procedures described on the "SDPD Reference Mouth Swab Collection Kit" envelope.

I. An officer who takes a mouth swab sample from a juvenile will notify the parent or legal guardian that a sample was taken. Notification will be documented on the JCR. Notification information includes the date and time of notification, as well as the name and telephone number of the person notified.

## XIV. INTERVIEWS OF JUVENILE SUSPECTS, VICTIMS OR WITNESSES AT PUBIC SCHOOLS - PROCEDURE FOR OBTAINING COURT ORDERS AFTER THE GREENE DECISION

NEW

A. In December 2009, the Ninth Circuit Court of Appeals ruled that removing a minor from a classroom for the purposes of conducting an investigative interview was a "seizure" under the Fourth Amendment. (*Greene v. Camreta.)* The court ruled that barring exigent circumstances, parental consent or a court order, the interview was unconstitutional. The social worker and sheriff's deputy who conducted the interview were subject to liability and the potential loss of "qualified immunity."

In May 2011, the Supreme Court vacated this portion of the Ninth Circuit Court's decision because the case was moot. Consequently, this area of law remains unsettled. Therefore, in the absence of parental consent or exigent circumstances, Department members will continue to seek a court order before interviewing juvenile victims, suspects, and witnesses.

B. A court order is not necessary when:

NEW

1. Department members are investigating incidents that were initiated at the school. An example of this would be when Department members receive information about a pending disturbance at the school or other incidents involving students that occurred on school grounds during school hours. This precedent is well established in existing case law that school administrators and government officials have a duty to maintain discipline at the school;

2. There are exigent circumstances; or,

3. There is parental/guardian consent.

C. To obtain a court order to conduct a victim or witness interview:

1. For cases involving sexual assaults, child abuse, child molest, or child neglect investigations, Department members will immediately contact the "on-call" Child Abuse or Sex Crimes supervisor.

2. For all other cases involving juvenile victims or witnesses necessitating a court order, the area station Juveniles Services Team supervisor or detective should be contacted.

3. Supervisors and detectives assigned to these units will assist the Department member with obtaining the court order.

4. Department members will complete an "ex parte" application and other documents that are not reviewed by either a district or city attorney. A supervisor will review the prepared documents prior to the Department member seeking the court order in Superior Court.

5. The procedure and documents for obtaining the court order, as well as Parental Consent Forms, in English and Spanish, are located in the Department's F Drive under F:/Templates/Greene Decision Documents. The "All Files" tab must be used to obtain the signed Points and Authority document which is in a PDF format.

NEW

6. The paramount issue is the safety and welfare of the minor. Reasonable steps must be taken by the Department member to obtain consent from the minors(s) parent or guardian prior to the interview. In the event the parent(s) or guardian(s) is (are) a suspect(s) or other exigent circumstances arise that precludes obtaining consent, these facts must be articulated in the Department member's report. The Department member will also memorialize the time the minor was removed from the classroom, the length of the interview, the time the minor was released from the interview, and whether the interview was recorded.

## XV. NOTIFICATION OF PARENT OR GUARDIAN

A. Welfare and Institutions Code § 627 states that when an officer takes a minor to a place of confinement, he will take immediate steps to notify the juvenile's parent, guardian, or a responsible relative that the minor is in custody and the location in which the minor is being held. The means of notification should be noted in the JCR. When a parent or guardian cannot be notified, an explanation must be included on the JCR (i.e., "Parents reside out of the County" or "Unable to locate or identify parents on basis of information furnished by the subject").

B. When notifying parents or guardians of minors residing within the City of San Diego, the arresting officer should make the notification by telephone when possible or leave a brief, written explanation of the circumstances at the residence.

C. When notifying parents or guardians residing within the County of San Diego, the arresting officer should make the notification by telephone when possible or make a request to the juvenile's local police or Sheriff's Department to make the notification.

D. When notifying parents or guardians residing outside the County of San Diego, the arresting officer will notify the parent or guardian by telephone or use the assistance of Teletype.

## XVI. UNDOCUMENTED JUVENILES

A. Welfare and Institutions Code § 300 - Dependent Children

1. Under 13 years of age

Children in this category will be transported to the Polinsky Children's Center if a parent or guardian cannot be contacted. The Polinsky Children's Center will determine the status and disposition of the child.

2. Thirteen years of age or older

a. If the juvenile's non-offending parent or guardian can be located, the juvenile will be released to them regardless of the family's immigration status.

b. If the juvenile's parent or guardian cannot be contacted, the juvenile will be released to Customs and Border Protection (CBP) agents. Transportation to a CBP facility is authorized for this purpose.

3. An ARJIS-9 report will be submitted detailing the circumstances of the detention and the disposition of the juvenile.

B. Welfare and Institutions Code § 601 - Status Offenses (i.e., curfew, truants, and runaways)

1. Under 13 years of age

a. If the juvenile's parents or guardians are in the United States and can be located, the juvenile will be released to them regardless of the family's immigration status.

b. If the parents reside in a foreign country, the juvenile will be transported to the Polinsky Children's Center.

2. Thirteen years of age or older

a. It is incumbent upon the Police Department to return juveniles without parental supervision to their parents, guardians, or school officials. If the parents or guardians are in the United States and can be contacted, the juvenile will be released to them.

b. If the juvenile's parent or guardian cannot be contacted, the juvenile will be released to Customs and Border Protection personnel. Officers are authorized to transport the juvenile when

CBP agents are unable to respond or there would be an excessive time delay.

3. A Juvenile Contact Report (ARJIS-8) will be completed detailing the circumstances of the detention.

C. Welfare and Institutions Code § 602 - Minor Offenses

1. Under 13 years of age

a. If the parent or guardian cannot be contacted, a court order is required before the Polinsky Children's Center will accept them. In these cases, personnel at the Polinsky Children's Center will be responsible for obtaining the court order. Officers will stand by until a disposition is reached by Juvenile Hall.

b. In cases where a court order is not issued, the arresting officer should contact the division's JST detective (day or night). The JST detective, with the assistance of the Juvenile District Attorney, will coordinate the placement of the juvenile in Juvenile Hall or the Polinsky Children's Center.

2. Thirteen years of age or older

If a juvenile is arrested and the parents or guardian cannot be contacted, the juvenile will be placed in Juvenile Hall.

3. A Juvenile Contact Report (ARJIS-8) will be completed detailing the circumstances of the arrest.

D. Welfare and Institutions Code § 602 - Serious Offenses

1. Juveniles arrested for serious and/or violent crimes shall be placed in Juvenile Hall.

2. Officers shall photograph and fingerprint (three print cards are required) the juvenile taken into custody. The photograph and fingerprints should be attached to the investigator's copy of the Juvenile Contact Report.

3. All arrests of undocumented juveniles shall be documented on a Juvenile Contact Report (ARJIS-8).

## XVII. JUVENILE FOREIGN NATIONALS

A. When on an officer arrests or otherwise detains a foreign national, international treaty obligations require notification of foreign authorities.

1. Officers should attempt to release juveniles to a parent or guardian.

2. Officers should take juvenile foreign nationals to Juvenile Hall when they are involved in the commission of serious/violent crimes or they cannot be released to a parent or guardian.

B. When juvenile foreign nationals are placed in Juvenile Hall, Juvenile Hall staff members will make the notification.

## XVIII. ADDITIONAL DEPARTMENT PROCEDURES RELATED TO JUVENILES

A. For information related to missing and/or runaway juveniles, refer to Department Procedure 3.09, "At- Risk" Missing/Runaway Juveniles, and Department Procedure 3.10, Not "At- Risk" Missing/Runaway Juveniles.

B. For information related to daytime loitering and truancy enforcement, refer to Department Procedure 3.11, Daytime Loitering Ordinance/Truancy.

C. For information related to curfew violations, refer to Department Procedure 3.12, Curfew Ordinance Enforcement.

# EXHIBIT 2
# TO SECOND
# AMENDED
# COMPLAINT

## P.D. v City of San Diego, et al
## SDPD Order 09 14

# SAN DIEGO POLICE DEPARTMENT
# ORDER

**DATE/TIME:** 06/12/09 – 0830 Hours

**NUMBER:** OR 09-14

**SUBJECT:** COLLECTION OF DNA MOUTH SWABS FROM JUVENILES

**ORG. #:** 69924

~~**SCOPE:** ALL MEMBERS OF THE DEPARTMENT~~

**DEPARTMENT PROCEDURE AFFECTED:** 3.08

---

Deoxyribonucleic acid (DNA) is a useful law enforcement tool for identifying and prosecuting criminal offenders and exonerating the innocent. The collection of DNA evidence plays an important role in solving a wide variety of crimes.

This Department Order clarifies when and how a juvenile can be swabbed for a DNA sample. Only under specific circumstances can a juvenile's DNA be taken and submitted to a State DNA databank. However, a juvenile's DNA can be taken and stored in the San Diego Police Department's own databank, if obtained legally and for investigative purposes.

<u>State Level DNA Databank (The DNA Act)</u>

The California Legislature enacted the DNA and Forensic Identification Database and Data Bank Act of 1998 (DNA Act) to ensure "the expeditious and accurate detection and prosecution of individuals responsible for sex offenses and other crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children."

Per Penal Code § 295 (b)(2), the DNA Act requires DNA "samples from all persons, including juveniles, for the felony and misdemeanor offenses described in subdivision (a) of Section 296."

The Department of Justice and the Federal Bureau of Investigation (FBI) work together to store and exchange DNA records from different states and national forensic laboratories. This information is stored in national and international DNA databases, such as the FBI's Combined DNA Index System (CODIS). This system includes both juvenile and adult suspects. CODIS is essential in assisting in the identification of suspects in crimes.

The collection of biological samples to send to the state level Department of Justice DNA databank for analysis and storage is restricted to qualified persons. The DNA Act and Penal

Code § 295.1 and 296 are very limited as to when biological samples can be taken from juveniles for the purpose of sending the information to a state level databank.

Pursuant to the DNA Act, there are only three types of juveniles that are required to provide DNA for law enforcement identification analysis and storage at the state level:

1. A juvenile who is *convicted* of or pleads guilty to any felony offense;

2. Any juvenile who is required to register under Section 290 or 457; or,

3. Any juvenile who is housed in a mental health facility or sex offender treatment program by court order after being charged with any felony offense.

Refer to Penal Code § 296(a)(1) and (3) for further details.

The collection of DNA and other identifying information from a juvenile, for the purpose of submitting it to the Department of Justice pursuant to the DNA Act, will most likely *not* be done by a San Diego Police Officer, but rather at the direction of a County Deputy Sheriff within Juvenile Hall after a felony conviction and with a court order. Collection and submission of a juvenile's DNA to a state level databank shall not be done unless the requirements of Section 296 are met.

Investigative Purposes and the Department's Local Databank

Law enforcement personnel can still collect biological samples from adults and juveniles, if they are for ***an investigative purpose*** to be held in the Department's local databank and not for the submission to a state level DNA database under the DNA Act.

The law recognizes the need to protect the public from criminal conduct by any perpetrators which includes minors. Reasonable suspicion must exist prior to the collection of evidence. Establishing articulated facts leading to the subject(s) potential involvement in the crime(s) should be clearly determined prior to the collection of DNA.

Obtaining mouth swab samples by scraping the inner cheek cells is permissible and not considered intrusive. Because this process is not painful, causes no lasting damage and no permanent effects, it is considered non-intrusive.

**In order to obtain such samples, law enforcement personnel must obtain consent from the suspected subject(s), obtain a search warrant, or obtain a court order.** Exigent circumstances will be virtually non-existent in most cases because DNA is a hereditary material in humans that does not change over time.

Patrol officers most often will be the first to encounter an incident that may result in the decision to collect DNA because further investigation is required. Patrol units dispatched to investigate a crime that may involve the collection of DNA, such as blood or a mouth swab, from a juvenile must follow particular and strict procedures.

An officer may take mouth swab samples from a juvenile for investigative purposes, either in the field or at a police station, under the following conditions:

A. The juvenile is being legally detained as a suspect in a criminal investigation;

B. If the juvenile is in a place of confinement, immediate steps must be taken to notify the juvenile's parent, guardian, or a responsible relative that the minor is in custody and the location in which the minor is being held, per W&I § 627. The means of notification should be noted on the Juvenile Contact Report (JCR). When a parent or guardian cannot be notified, an explanation must be included on the JCR;

C. The juvenile has been identified and the means by which he/she was identified (i.e. school identification card, passports, California I.D., etc.) is documented in the JCR;

D. A Juvenile Contact Report (JCR) documenting the circumstances for the contact and reasons for the detention is completed;

E. To obtain a mouth swab from a juvenile under the age of 14 years, it must be established that the juvenile knew what he/she did was wrong at the time the crime was committed. Children under the age of 14 years are not considered capable of committing a crime, UNLESS there is clear proof that WHEN they committed the crime, they knew its wrongfulness, per Penal Code § 26;

F. Prior to collecting a mouth swab sample, officers will notify their immediate supervisor or contact the field lieutenant for approval. During normal business hours, the officer will contact the detective sergeant assigned to the unit affected (i.e., Sex Crimes, Child Abuse, Juvenile Services Team). After business hours, officers will ensure their immediate supervisor has been notified and briefed on the circumstances, prior to the collection, and obtain approval to collect the sample. Officers must document the approving supervisor's name in the JCR;

G. Officers shall fill out the "Consent to Collect Saliva Sample" form and obtain the signature of the juvenile. This form must be included in the police report;

H. Once approval is obtained, the officer will ensure the mouth swab sample is obtained in a controlled environment, outside of public view. The officer obtaining the sample will also ensure a witness is present during the collection. The witness officer's information will be documented on the report;

I. Officers will obtain one mouth swab sample at a time and ensure the process is complete prior to collecting an additional mouth swab sample;

J. Officers will ensure they follow the procedures described on the "SDPD Reference Mouth Swab Collection Kit" envelope;

K. An officer who takes a mouth swab sample from a juvenile will notify the parent or legal guardian that a sample was taken. Notification will be documented on the JCR. Notification information includes the date and time of notification and the name and telephone number of the person notified.

Department Procedures 3.08, Juvenile Procedures, will be updated to reflect these changes.

---

Please read at squad conferences and give a copy to all personnel.

# EXHIBIT 3
# TO SECOND AMENDED COMPLAINT

## P.D. v City of San Diego, et al
## SDPD DNA Consent Form

## SAN DIEGO POLICE DEPARTMENT

### Voluntary and Informed Consent for Collection of Biological Samples to be Used for DNA Profiling and Comparison

I, ______________________________ (NAME), _______________ (DOB), of

____________________________________________________________ (ADDRESS)

give consent to the San Diego Police Department to take a DNA sample for analysis. I understand that I have a right to refuse. I understand that as a result of providing this sample, a DNA profile will be generated and used in this investigation.

I fully understand that after analysis, the DNA profile will be entered into the local DNA database, and I consent to allow my DNA profile to be compared against other DNA profiles and/or used only for legitimate law enforcement purposes. ***Victim and consensual partner samples will not be entered into the local DNA database.***

I have read and understand the above statement and I consent to this process. This consent is knowingly and voluntarily being given to the San Diego Police Department as a result of my own free will without any threats or promises having been made to me.

Date: ________ Time: ________ ________________________________

(Signature)

Witness: __________________________

Witness: __________________________

# DEPARTAMENTO DE POLICÍA

# DE SAN DIEGO

**Consentimiento Voluntario y de Conformidad para Recolectar Muestras Biológicas con el Fin de Generar y Comparar el Perfil de ADN**

Yo, (Nombre)________________________________,(Fecha de Nacimiento) ________________,

(con domicilio en)________________________________________________________________,

otorgo mi consentimiento al Departamento de Policía de San Diego para tomar una muestra de ADN para ser analizada. Entiendo que tengo derecho a rechazar este proceso. Entiendo que como resultado de proporcionar esta muestra se generará un perfil de ADN, el cuál será utilizado en esta investigación.

Estoy en completo acuerdo que después de éste análisis, el perfil de ADN quedará registrado en la base de datos local de ADN , y doy mi consentimiento para que mi perfil de ADN se compare con otros perfiles de ADN y/o sea utilizado solo para fines policiales legítimos. ***Las muestras de ADN de la víctima y de la pareja consensual no quedarán registradas en la base de datos local de ADN.***

He leído y entiendo la declaración anterior en su totalidad, y doy mi consentimiento para que se realice este proceso. Hago entrega de este consentimiento en conformidad y voluntariamente al Departamento de la Policía de San Diego, bajo mi propio consentimiento, y sin amenaza o promesa alguna hecha a mi persona.

Fecha: _____________ Hora: __________ ________________________________________

(Firma)

Firma del Testigo: ____________________________

Firma del Testigo: ____________________________

# SỞ CẢNH SÁT SAN DIEGO
## Tự Nguyện và Am Hiểu Bằng Lòng Cho Phép Lấy Mẫu Thử Nghiệm Cấu Tử Cơ Bản Của Tế Bào Di Truyền (DNA) Để Phân Tích Và So Sánh

Tôi, ____________________________________________(Họ và Tên),

____________________________________________(Ngày Tháng Năm Sinh),

____________________________________________(Địa Chỉ Cư Ngụ),

bằng lòng cho Sở Cảnh Sát San Diego lấy mẫu Cấu Tử Cơ Bản Của Tế Bào Di Truyền (DNA) để thử nghiệm phân tích. Tôi hiểu rằng tôi có quyền từ chối. Tôi hiểu rằng kết quả của việc cung cấp mẫu thử nghiệm phân tích này, thì một sơ lược tiểu sử Cấu Tử Cơ Bản Của Tế Bào Di Truyền (DNA) sẽ được tạo ra và sẽ được dùng trong sự việc điều tra này.

Tôi hoàn toàn hiểu rằng sau khi mẫu thử nghiệm đã được phân tích, sơ lược tiểu sử Cấu Tử Cơ Bản Của Tế Bào Di Truyền (DNA) này sẽ được lưu trữ trong cở sỡ dữ liệu DNA địa phương, và tôi bằng lòng cho phép sơ lược tiểu sử Cấu Tử Cơ Bản Của Tế Bào Di Truyền (DNA) của tôi được dùng đối chiếu với những sơ lược tiểu sử Cấu Tử Cơ Bản Của Tế Bào Di Truyền (DNA) khác cho các mục đích thực thi phát luật. **Các mẫu thử nghiệm của nạn nhân hay của người có quan hệ tình dục với nạn nhân sẽ không được lưu trữ trong cở sỡ dữ liệu DNA địa phương.**

Tôi đã đọc và hiểu những lời phía trên và tôi bằng lòng cho sự tiến hành này. Sự bằng lòng này là do hoàn toàn do sự hiểu biết và tự nguyện của tôi cho phép Sở Cảnh Sát San Diego lấy mẫu thử nghiệm, không có sự hăm dọa hay bất cứ một lời hứa hẹn nào cả.

Ngày:____________Giờ:____________ ______________________________

(Chữ Ký)

Nhân Chứng:______________________________

Nhân Chứng:______________________________

Vietnamese Version

# EXHIBIT 4
# SECOND
# AMENDED
# COMPLAINT

## P.D. v City of San Diego, et al
## Claim to City of San Diego

AMERICAN CIVIL LIBERTIES UNION
SAN DIEGO & IMPERIAL COUNTIES
FOUNDATION

September 27, 2016

City of San Diego
Risk Management Department
1200 Third Ave., Suite 1000
San Diego, CA 92101

Re: Unlawful Search and Seizure of [redacted] – Claim

To Whom it May Concern:

Pursuant to Government Code §§ 900 *et seq.*, enclosed please find a claim against the City of San Diego and several San Diego Police Department officers submitted on behalf of [redacted], a minor, through his parent and guardian, Jamie Wilson. The claim provides all information required by Government Code § 910 and need not be submitted on the city's form. *Blair v. Superior Court* 218 Cal. App. 3d 221, 224-26 (1990). Counsel has signed the application and the claim, as authorized by Government Code § 910.2.

Very truly yours,

Bardis Vakili
ACLU Foundation of
San Diego & Imperial Counties

ACLU of San Diego & Imperial Counties
PO Box 87131 San Diego, CA 92138-7131
p/619.232.2121 f/619.232.0036
www.aclusandiego.org info@aclusandiego.org

Bostwick & Jassy
12400 Wilshire Boulevard, Suite 400
Los Angeles, CA 90025
Phone (310) 970-6059 Fax (310) 314-8401
www.bostwickjassy.com

# CLAIM

(Government Code § 910)

To: CITY OF SAN DIEGO

1. Claimant's name and post office address:

[redacted] a minor, through his parent and guardian, Jamie Wilson
[redacted]

2. Post office address to which notice shall be sent:

Bardis Vakili
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA 92138-7131

3. Date, place, and other circumstances of occurrences giving rise to the claim:

On Wednesday March 30, 2016, at around 3:25 pm, [redacted] and four other boys were leaving the Memorial Park Recreational Center in San Diego, California. A police car drove up on the grass of the park and pulled up to them, based on a report from unmarked detectives that five African American males wearing blue were walking through Memorial Park. The officers had no reasonable suspicion or probable cause that any of the boys committed any crime or were armed and dangerous.

The officers exited the car, ordered the boys to stop, and proceeded to pat the boys down, discovering no weapons or contraband. The officers then cuffed the boys, including [redacted], and checked their pockets. Again, no weapons or contraband were discovered. The officers informed [redacted] and the others that they were being detained, that they could not speak with each other, and that they must remain seated while detained. The officers had no information that any of the boys were on probation or parole or otherwise subject to any waiver of their constitutional rights. A search of bags that some of the boys had been carrying yielded an unloaded .38 Smith and Wesson revolver, but no ammunition. [redacted] was then placed in the back of a police cruiser.

The officers then purported to ask each of the boys to sign a document permitting them to swab the boys' cheeks for DNA, telling them they would be free to go after the swab. Each of [redacted] four companions signed the document and were released after officers collected DNA and took their photographs. Officers then called [redacted] out of the car and purported to ask him to sign a document permitting them to swab in his mouth for DNA. [redacted] signed the form.. The officers collected [redacted] DNA, cuffed him again, and put him back in the police car. The time from initial stop to the DNA swab was close to an hour.

[redacted] was arrested and charged with felonies involving gun possession. He spent several days in juvenile hall before the juvenile court released him on home supervision. His attorney filed a motion to suppress the evidence against him, based on his claim that the stop was unjustified by reasonable suspicion. The juvenile court granted the motion to suppress and dismissed the charges.

4. General description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim:

- Out of pocket expenses regarding criminal defense, court costs, and home supervision, among other expenses associated with the detention, arrest, prosecution, and incarceration of [redacted].
- Loss of past and future income.
- Damages arising from emotional and physical suffering, including actual, punitive, or nominal damages, or some combination of the foregoing.

5. Name or names of public employees causing injury, damage, or loss:

Officer Aziz Brou (ID # 6558)
Officer Kelly Stewart (ID # 6291)
Sergeant Rivera (ID # 5336)
Others not yet known to claimant.

6. Amount claimed:

No amount stated, pursuant to Government Code § 910(f). This case would not be a limited civil case.

Dated September 27, 2016

Submitted on behalf of [redacted] through his parent and guardian Jamie Wilson

By: ______________________

Bardis Vakili
(See Govt. Code § 910.2)

# PROOF OF SERVICE BY MAIL
# SAN DIEGO COUNTY
# STATE OF CALIFORNIA

I, Aude Ruffing, declare:

On Tuesday, September 27th, I served a copy of the cover letter and the Government Code claim under section 910 by mail via Fedex and addressed as follows:

City of San Diego
Risk Management Department
1200 Third Ave., Suite 1000
San Diego, CA 92101

It was delivered on Wednesday, September 28th – see Fedex confirmation receipt.

I declare, under penalty of perjury, that the foregoing is true and correct.

Date 09/30/2016

My Profile | Support | Locations | English

Search or tracking number

Shipping Tracking Manage Learn FedEx Office ® Login

# FedEx ® Tracking

## 784199347990

Ship date:
**Tue 9/27/2016**
SAN DIEGO, CA US

**Delivered**
*Signature release on file*

Actual delivery:
**Wed 9/28/2016 12:35 pm**
SAN DIEGO, CA US

## Travel History

| Date/Time | Activity | Location |
|---|---|---|
| 9/28/2016 - Wednesday | | |
| 12:35 pm | Delivered<br>Package delivered to recipient address - release authorized | SAN DIEGO, CA |
| 8:53 am | Delivery exception<br>Customer not available or business closed | SAN DIEGO, CA |
| 8:11 am | On FedEx vehicle for delivery | SAN DIEGO, CA |
| 7:19 am | At local FedEx facility | SAN DIEGO, CA |
| 9/27/2016 - Tuesday | | |
| 4:35 pm | Picked up | SAN DIEGO, CA |
| 3:49 pm | Shipment information sent to FedEx | |

## Shipment Facts

| | | | |
|---|---|---|---|
| **Tracking number** | 784199347990 | **Service** | FedEx Priority Overnight |
| **Weight** | 0.5 lbs / 0.23 kgs | **Total pieces** | 1 |
| **Total shipment weight** | 0.5 lbs / 0.23 kgs | **Terms** | Shipper |
| **Invoice number** | PKG ID: 141233 | **Packaging** | FedEx Envelope |
| **Special handling section** | Deliver Weekday | **Standard transit** | 9/28/2016 by 10:30 am |

Search or tracking number

**Customer Focus**
New Customer Center
Small Business Center
Service Guide
Customer Support

**Company Information**
About FedEx
Careers
Investor Relations
Subscribe to FedEx email

**Featured Services**
FedEx Delivery Manager
FedEx SameDay
FedEx Home Delivery
FedEx TechConnect
Healthcare Solutions
Online Retail Solutions
Packaging Services
Ancillary Clearance Services

**Other Resources**
FedEx Compatible
Developer Resource Center
FedEx Ship Manager Software
FedEx Mobile

**Companies**
FedEx Express
FedEx Ground
FedEx Office
FedEx Freight
FedEx Custom Critical
FedEx Trade Networks
FedEx CrossBorder
FedEx SupplyChain

**Follow FedEx**

United States - English

Ask FedEx

© FedEx 1995-2016

Global Home | Site Map | fedex.com Terms of Use | Security and Pr

# EXHIBIT 5
# TO SECOND
# AMENDED
# COMPLAINT

## P.D. v City of San Diego, et al
## City of San Diego Claim Denial

The City of SAN DIEGO

**Risk Management**
Public Liability

December 01, 2016

[redacted]
through his parent and guardian, Jamie Wilson
c/o Bardis Vakili
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA 92138-7131

Reference: City File #: 13445
Date of Incident: 03/30/2016
Claimant: [redacted] through his parent and guardian, Jamie Wilson

Dear [redacted] and Mr. Wilson:

Your claim against the City of San Diego was referred to this office for investigation and a determination of the City's legal liability.

Please be advised that, pursuant to California Government Code section 912.4, your claim is deemed to be denied by operation of law.

**Subject to certain exceptions, you have only 6 months from the date that this notice was personally delivered to you or deposited in the mail to file a court action on this claim.** See Government Code section 945.6.

You may seek the advice of an attorney of your choice, and at your own expense, in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Sincerely,

Robin Hines
Claims Representative

1200 Third Ave., Suite 1000, MS 51B
San Diego, CA 92101
riskmanagement@sandiego.gov

T (619) 236-6670
www.sandiego.gov/riskmanagement